UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BANJO CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01770-SEB-MG |
| | ) | |
| GREEN LEAF, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |
| | ) | |
| GREEN LEAF, INC., | ) | |
| | ) | |
| Counter Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BANJO CORPORATION, | ) | |
| | ) | |
| Counter Defendant. | ) | |
| ——————————————— | ) | |
| | ) | |
| FEDERATED MUTUAL INSURANCE COMPANY, | ) | |
| | ) | |
| Intervenor | ) | |
| Defendant. | ) | |

**ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Banjo Corporation ("Banjo") brought this trademark infringement and unfair competition action against Defendant Green Leaf, Inc. ("Green Leaf"), alleging that Green Leaf deliberately copied Banjo's Yellow Handle® Design as part of a calculated effort to divert sales away from Banjo through consumer confusion, in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and Indiana common law. Green Leaf filed a

1

counterclaim against Banjo, seeking the cancellation of Banjo's registration of the Yellow Handle® Design. Now before the Court is Banjo's Motion for Partial Summary Judgment, dkt. 84, and Green Leaf's Motion for Summary Judgment, dkt. 124. For the reasons stated below, Banjo's motion is **GRANTED in part** and **DENIED in part**, dkt. 84, and Green Leaf's motion is **DENIED**, dkt. 124.

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because summary judgment requires "no *genuine* issue of *material* fact," "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247−48 (1986) (emphasis in original). Material facts are those that "might affect the outcome of the suit," and a dispute of material fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

"The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: we construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017) (citation omitted). Where the movant seeks "summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so-one sided as to rule out the prospect of finding" in the non-movant's favor. *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). "If the

movant has failed to make this initial showing, the court is obligated to deny the motion." *Id.*

## FACTUAL & PROCEDURAL BACKGROUND

Throughout the course of this litigation, which has pended on our docket for more than two years, the parties have demanded judicial intervention to resolve an excessive number of discovery- and case management-related disagreements. *See, e.g.*, dkt. 67, 77, 78, 92, 93, 99, 104, 104, 110, 115, 118, 137, 145, 188. Only now do we arrive at the merits of the trademark infringement dispute at the heart of this litigation. In reciting the facts below, we have omitted the parties' editorial embellishments and legal argumentation improperly embedded in their presentations of record as well as factual assertions unsupported by citations to the record. *See* S.D. Ind. L.R. 56-1 cmt. (a)–(b), (e).

## I.    The Parties

### A.    Banjo & the Original Yellow Handle

Banjo Corporation (formerly known as Terra-Knife and Terra-Products) is an Indiana-based manufacturer of liquid handling products utilized in the commercial, industrial, and agricultural sectors. Hays Decl. ¶¶ 2, 8, dkt. 112-1. According to John Hays ("Mr. Hays"), the Business Line Leader, Pumps & Compressors of Advanced Flow Solutions of IDEX Corporation ("IDEX"), Banjo's parent company, "Banjo is a leading provider of control valves for regulating the flow of liquids in hoses and pipes." *Id.* ¶ 2. Since 1994, Banjo has regarded the color yellow as a signature feature of its brand, incorporating the color into its marketing materials as well as the products themselves. *Id.* ¶ 3. In the early 2000s, Banjo began marketing its control valves as the "original yellow handle." Wagner Aff. ¶

12, dkt. 124-5; Bezdicek Aff. ¶ 10, dkt. 124-7. Prior to 2018, Banjo was not aware of any competitor making more than the occasional or sporadic use of yellow handles on valves or valve-related products specific to the agricultural market. Hays Decl. ¶ 4, dkt. 112-1.

Banjo's revenues are generated primarily through sales to product distributors in the agricultural sector, who, in turn, sell Banjo's products to end-users (namely, farmers). *Id.* ¶ 10. At a typical outlet, the distributor displays Banjo's and Banjo's competitors' products in bins and/or on shelves, often without packaging, making it especially important to Banjo that its products are visually distinguishable from those of its competitors. *See id.* According to Mr. Hays, Banjo has previously "sold approximately 675,000 units of its Yellow Handle® valves annually (representing tens of millions of dollars)," *id.* ¶ 3, though Banjo has not yet provided further evidence of its revenues beyond Mr. Hays's written statements.

Currently, Banjo sells approximately 150 types of yellow handle control valves as well as companion fittings and the like, all of which bear a four-digit alpha-numeric identification code (e.g., "V050"). *Id.* ¶¶ 6, 9. Banjo's end-users, primarily farmers, rely on these identification codes to locate replacement parts and/or to restock their inventories. *Id.* ¶ 11.

### B.    Green Leaf & the TerreMax Brand

Green Leaf is also an Indiana-based manufacturer of liquid-handling products that competes with Banjo in the production and sale of control valves. Goda Aff. ¶ 3, dkt. 124-4. (Other competitors in the liquid handling industry include, but are not limited to, Apache, Bee Valve, Norwesco, and Kuriyama. Bezdicek Aff. ¶ 6, dkt. 124-7.) Green Leaf had predominantly used green in its branding and products. *See generally* dkt. 112-15 at 5–10, 16,

4

107–13; *e.g.*, dkt. 112-13 (screenshot of Green Leaf's website as it appeared in May 2014, showing photo of green handled valve); dkt. 112-14 (screenshot of Green Leaf's website as it appeared in December 2015, showing photo of green handled valve); Cummings Decl. ¶¶ 4–5, dkt. 112-12 (authenticating screenshots); dkt. 112-20 at 6 (October 2019 email referring informally to Green Leaf's "trademark green color"). That said, Peter Goda ("Mr. Goda"), Green Leaf's owner and President, asserts that Green Leaf has also sold yellow handled valves continually since 1998. Goda Aff. ¶ 6, dkt. 124-4.

Prior to 2018, Green Leaf generated most of its revenues through sales to retail stores, such as Farm & Fleet, Tractor Supply, and Menards. Goda Dep. 25:23–25, dkt. 112-16. In the mid-2010s, however, Green Leaf made the decision to begin targeting growth opportunities in the commercial agriculture sector where Banjo had predominated. *See* Goda Aff. ¶ 7, dkt. 124-4. According to Green Leaf, the decision to target commercial agriculture was motivated, in part, by reported deficiencies in its competitors' (namely, Banjo's) ability to fulfill customer demands. *Id.* ¶ 8.

In 2018, Green Leaf launched its commercial agriculture division under the name "TerreMax." In Mr. Goda's words, the distinction between Green Leaf and TerreMax is "a branding thing," since their overall "operation's pretty much the same." Goda Dep. 25:22–23, dkt. 112-16. Through its TerreMax brand, Green Leaf offers a robust selection of heavy-duty liquid handling products with an emphasis on uses in commercial agriculture. *See, e.g.*, Bezdicek Dep. 82:11–21, dkt. 112-19. As outlined in greater detail below, this lawsuit relates principally to Green Leaf's creation of its TerreMax division.

## II.    Green Leaf Hires Two Former Banjo Employees

In gearing up to expand its reach into commercial agriculture, Green Leaf hired two longtime Banjo employees: Matthew Wagner ("Mr. Wagner") and Vincent Bezdicek ("Mr. Bezdicek").

### A.    Mr. Wagner

Mr. Wagner began his career with Banjo in the 1980s, where he worked in sales for approximately thirty years. Wagner Aff. ¶ 3, dkt. 124-5. Mr. Wagner states by affidavit that he departed from Banjo because he felt that Banjo "was not providing proper service" to its customers. *Id.* ¶ 15. According to Mr. Hays, "Banjo had some concern" that Mr. Wagner surreptitiously transmitted "documents" to his private Yahoo! account, though Banjo has neither confirmed its suspicions nor formally pursued the matter. Hays Decl. ¶ 17, dkt. 112-1. Sometime after Mr. Wagner officially terminated his employment with Banjo (though it is unclear exactly when), Green Leaf contacted Mr. Wagner to offer him a sales position. *Id.* ¶ 16.

In December 2016, Mr. Wagner began employment with Green Leaf as a sales representative. *See* Wagner Suppl. Aff. ¶ 3, dkt. 124-29. On December 21, 2016, Banjo wrote to Green Leaf detailing "post-employment contractual and other legal obligations" that Mr. Wagner purportedly owed to Banjo as his former employer. Hays Decl. ¶ 17, dkt. 112-1; dkt. 112-10. The letter stated, in relevant part, that Mr. Wagner was bound by a one-year non-compete agreement and that Mr. Wagner had a continuing obligation to safeguard and protect Banjo's confidential information. *See* dkt. 112-10 at 2–3. Although Banjo "urge[d]"

6

Green Leaf's legal counsel to follow up with Banjo's in-house counsel, it appears that no further action was taken by Banjo in this regard at that time. *Id.* at 4.

Enclosed in the December 21st letter was a copy of the "Employee Confidential Information, Work Product, and Non-Solicitation Agreement" to which Banjo contends Mr. Wagner was bound. *Id.* at 2. Mr. Wagner, however, maintains that he "never signed" any such agreement with Banjo and that the purported employment agreement is "fraudulent." Wagner Suppl. Aff. ¶¶ 5–6, 8–9, dkt. 124-29; Wagner Dep. 40:6–21, dkt. 112-17. To demonstrate the inauthenticity of the purported employment contract, Mr. Wagner high-lights its improper pagination: The *eighth* and final page bearing his signature (dated May 18, 2007) is enumerated as page six. *Id.* ¶ 6–7. Mr. Wagner alleges that Banjo likely at-tached a signature page from a different, unidentified agreement to create the appearance that Mr. Wagner signed a non-compete agreement. *Id.* In light of this factual dispute, the substance and scope of Mr. Wagner's purported contractual obligations to Banjo remain unclear.

### B.    Mr. Bezdicek

Mr. Bezdicek began his thirty-six-year sales career with Banjo in 1979, which ex-tended through his retirement in 2015. Bezdicek Aff. ¶¶ 2, 5, 11, dkt. 124-7. Prior to his retirement, Mr. Bezdicek reportedly had begun to "experience difficulties with [Banjo's] management," namely, with regard to Banjo's ability to meet customer demands. *Id.* ¶ 12. On December 10, 2015, Mr. Bezdicek affirmed that he had read and understood Banjo's Code of Ethics and Business Conduct. Hays Decl. ¶ 17, dkt. 122-1; dkt. 112-11.

Following his departure from Banjo, Mr. Bezdicek was also contacted by Green Leaf about joining Green Leaf's sales team and helping to launch TerreMax. Bezdicek Aff. ¶ 13, dkt. 124-7. Internal email correspondence between Mr. Goda and Green Leaf's Vice President of Sales and Marketing Teko Goda ("Teko") reveals that, in December 2016, Green Leaf believed hiring Mr. Bezdicek "would be a good move" because "[h]e has a lot of relationships with people that are loyal to him personally." Dkt. 112-22 at 3. Mr. Bezdicek began working for Green Leaf in mid-2017.

### III.    Green Leaf Prepares to Launch TerreMax

Throughout 2017, Green Leaf undertook various steps aimed at improving "every product category" by adding hundreds of products to its catalog in order to "get new business away from [its] competitors" utilizing its new TerreMax branding. Bezdicek Dep. 80:11–14, dkt. 112-19. In April 2017, Green Leaf "made a big financial commitment to order a bunch of new tooling so the product line will look like Banjo's." Dkt. 113-7 (April 2017 email from Mr. Wagner) (under seal). Indeed, during "Phase 1" of what Green Leaf referred to as "Project Banjo," Green Leaf budgeted $250,000 for "new tooling to duplicate Banjo." Dkt. 113-2 at 4 (capitalization modified) (under seal). Internal correspondence reveals that Green Leaf employees prepared "a breakdown of what we have compared to what Banjo has." *Id.* at 3. These retooling efforts included "add[ing] material" to existing products in order "to match Banjo['s] profile" and "renumber[ing] everything to match Banjo." *Id.* at 5.

Green Leaf prepared a detailed spreadsheet itemizing and comparing the prices of hundreds of different products manufactured and sold by Green Leaf, Banjo, Norwesco,

and Bee Valve, among others. *See generally id.* at 6–15. This price and parts comparison spreadsheet reveals that, at that time, many of Green Leaf's products did not match Banjo's (even for "compatible" parts), and none of the other competitors utilized a parts numbering system that replicated Banjo's. *See id.*

In addition to emulating Banjo's product selection and alphanumeric identification system, Green Leaf opted to use yellow, rather than its "trademark green color," on the control valve handles. Dkt. 112-20 at 6. Indeed, a June 2017 email thread reveals that Green Leaf color matched the handles by using a sample of Banjo's product. *See* dkt. 112-23 at 8–9. At that time, Green Leaf chose to "leav[e] [its] name off the valve handles to allow [its] customers to apply their own decals if they so choose." Dkt. 112-20 at 6. *See generally* dkt. 133-4 (2018 TerreMax catalogue showing only unlabeled valve handles). (Green Leaf maintains that it embosses TerreMax handles with a distinctive mountain logo without acknowledging the record evidence to the contrary. Dkt. 124-30.)[1]

In a September 2018 email to Green Leaf's outside accountant, Mr. Goda expressed optimism in response to Green Leaf's success:

> [W]e are winning the battle against Banjo. We identified this opportunity about 2 years ago at which time we were able to hire two long term Banjo employees/salesman and begin to make plans to take market away from them. As Banjo struggled with product quality, delivery and basic customer knowledge we moved in. Last year we invested around ½ million dollars in machinery and tooling to better position ourselves in the Commercial Ag market. We've been able to secure a number of new accounts ranging from small to midsize and have also begun making headway with some of Banjo's

---

[1] In its response/reply brief, Banjo included a photo of two yellow valve handles, ostensibly to demonstrate the absence of any logo on Green Leaf's yellow valve handles. Dkt. 132 at 19. Because Banjo did not cite any source for this photo, or elaborate on its context, it is entirely unclear to us what evidentiary value this photograph bears on the claims before us.

larger accounts. In the past 16 months we've added 170+ new accounts, 11 in our top 50. The opportunity is still very real for us to continue and take market share away from them. We will continue to invest and work heavily to do so. We are launching a new Division of Green Leaf, Inc. this fall to directly target the Commercial Ag sector and where Banjo has/had the strongest foot hold. TerreMax is the name of our new division. Over the last 12-18 months we've listed to these customers and we feel confident we have developed a formula that will help us succeed.

Dkt. 112-32.

## IV.    Banjo's February 2018 Cease-and-Desist Letter

Green Leaf formally launched TerreMax in 2018, though it is unclear precisely when during that year. On February 20, 2018, Banjo issued a cease-and-desist letter to Green Leaf, contending that Green Leaf was actively engaging in trade dress violations, false advertising, and unfair trade practices. Dkt. 124-9. Specifically, Banjo took issue with Green Leaf's "most recent catalog" that included various ball valves in "a distinctive yellow handle in violation of Banjo's protected trade dress." *Id.* at 1. Banjo also alleged that Green Leaf's newly-developed "Parts Compatibility Guide" falsely represented a functional compatibility between Banjo's and Green Leaf's products. Banjo also highlighted that the timing of Green Leaf's "switching to Banjo's color scheme . . . and copying Banjo's part numbers" began shortly after Green Leaf hired Messrs. Wagner and Bezdicek. *Id.* at 2. Notably, Banjo reported that Mr. Wagner had "emailed certain confidential, proprietary and trade secret information belonging to Banjo . . . to his private Yahoo email account shortly before he" departed (though, as previously mentioned, Banjo has not sought recourse against Mr. Wagner himself). *Id.*

Green Leaf responded to Banjo's cease-and-desist letter on February 23, 2018, asking Banjo to identify specific instances of actual customer confusion; to elaborate on how Green Leaf's statements re: its Parts Compatibility Guide were false and misleading; and to describe what types of confidential and trade secret information Green Leaf might have in its possession as well as how such information was being misused. Dkt. 124-10. According to Green Leaf, Banjo never replied. Hence, the matter was pursued no further at that time.

## V.    Interim Developments

The record before us at this juncture does not provide a clear picture of any developments that might have unfolded throughout 2020 and most of 2021, which void Banjo attributes to the supply-chain complications caused by the COVID-19 pandemic. Hays Decl. ¶ 18, dkt. 112-1. The record nonetheless does reveal the following relevant developments:

### A.    The Yellow Handle® Design

In November 2018, Banjo applied, albeit unsuccessfully, for a trademark registration of the yellow handle design. *See* dkt. 124-23. Approximately a year-and-a-half later, in July 2020, Banjo renewed its application and, on December 28, 2021, successfully obtained a registered trademark for the Yellow Handle® Design depicted below:



Dkt. 124-16; dkt. 124-24. According to the registration certificate, the "mark consists of the color yellow as applied to the entire handle portion of the valve." Dkt. 124-16 at 1. The dotted lines and color white are demonstrative and are not features of the trademark. *Id.* (The generic valve handle design, as outlined in the image above, is not at issue in this case.)

### B.    IDEX Initiates Acquisition Talks

In July 2022, IDEX representatives, acting on behalf of Banjo, contacted Mr. Goda with Green Leaf to propose a potential acquisition. Hays Decl. ¶ 19, dkt. 112-1. Through mid-August 2022, the company representatives continued their negotiation efforts. As revealed in the email thread between the companies' representatives, IDEX was highly complimentary of Green Leaf, stating to Mr. Goda: "You're leading a wonderful business. IDEX shares your passion for building great teams and serving the ag industry. I am excited about the prospects of learning more and sharing the vision of Ag at IDEX"; and "You and your team have built a very special company. IDEX . . . share[s] your values." Dkt. 124-15 at 5, 20. Ultimately, however, no final agreement was ever reached.

IDEX's motive for initiating this acquisition has not been clearly explained: Mr. Hays maintains that Banjo was attempting to avoid the need for litigation, Hays Decl. ¶ 19,

dkt. 112-1; whereas Green Leaf contends that no such purpose was ever disclosed, either in writing or in any other communication, Goda Aff. ¶¶ 55–58, dkt. 124-4.

## VI.   Procedural History

A year later, on September 29, 2023, Banjo filed a three-count complaint against Green Leaf asserting claims for (1) trademark/trade dress infringement, pursuant to 15 U.S.C § 1114(1); (2) unfair competition, false designations of origin, and false advertising, pursuant to 15 U.S.C. § 1125(a); and (3) unfair competition and trademark infringement under Indiana common law. Compl. ¶¶ 44–66, dkt. 1. In an answer denying all counts against it, Green Leaf asserted five separate affirmative defenses as well as a counterclaim for the cancellation of Banjo's trademark on the Yellow Handle® Design, pursuant to 15 U.S.C. § 1119. Dkt. 14. Green Leaf's affirmative defenses include: the statute of limitations; laches; functionality and lack of secondary meaning; abandonment; and lack of trademark significance. *Id.*

On January 13, 2025, Banjo moved for partial summary judgment, seeking the dismissal of Green Leaf's counterclaim to cancel the trademark registration and the denial of Green Leaf's five affirmative defenses. Dkt. 84. (On that same day, Green Leaf cross-moved for summary judgment on all counts, though that motion was subsequently stricken relating to case management purposes. Dkt. 97.) On April 28, 2025, Green Leaf cross-moved for summary judgment, opposing Banjo's partial summary judgment motion and seeking the dismissal of Banjo's trademark infringement and unfair competition claims as well as the cancellation of Banjo's Yellow Handle® Design. Dkt. 124. On June 20, 2025, Banjo filed a reply/response brief in support of its motion for partial summary judgment

13

and in opposition to Green Leaf's motion. Dkt. 132. On June 27, 2025, Green Leaf filed a reply in support of its summary judgment motion. Dkt. 134. The parties' cross-motions for summary judgment are now fully briefed and ripe for ruling.

## DISCUSSION

We begin by noting that the parties' respective views of the relevant facts and circumstances are diametrically opposed: Banjo, on one hand, alleges that Green Leaf embarked on a multifaceted plan to steal business away from Banjo by copying as closely as possible Banjo's Yellow Handle® Design, hiring two former Banjo salespeople, misappropriating one or more of Banjo's customer lists, launching the TerreMax product line comprised exclusively of Banjo lookalikes, and systematically underpricing Banjo to encourage product substitution. In denying these allegations, Green Leaf argues that the production and sale of yellow-handled control valves is a generic and ubiquitous aspect of the liquid-handling industry and that this lawsuit reflects an attempt by Banjo to prevent lawful, free market competition by maintaining a monopoly on the use of the color yellow. Dkt. 134 at 5–6.

Below, we shall first address Green Leaf's motion for summary judgment on Banjo's legal claims before turning to the parties' cross-motions for summary judgment on Green Leaf's affirmative defenses and counterclaim.

## I.    Banjo's Legal Claims

Green Leaf seeks summary judgment on the legal claims asserted against it by Banjo in this lawsuit, which include two federal claims for trademark infringement and unfair competition, pursuant to §§ 1114(1) and 1125 of the Lanham Act, respectively, as well as

a claim for trademark infringement and unfair competition under Indiana common law. "A trademark is any word, name, symbol, or device, or any combination thereof, used to identify a person's good and to distinguish it from those goods manufactured or sold by others." *Phoenix Ent. Partners v. Rumsey*, 829 F.3d 817, 822 (7th Cir. 2016) (citing 15 U.S.C. § 1127). "The Lanham Act established a federal right of action for trademark infringement to protect both consumer confidence in the quality and source of goods and businesses' goodwill in their products." *Id.* (citation modified).

Section 1114(1) of the Lanham Act provides "a cause of action for the unauthorized use of a registered trademark." *Id.* Specifically, § 1114(1) "renders a person liable in a civil suit when he 'use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.' " *Id.* (quoting 15 U.S.C. § 1114(a)) (citation modified).

Section 1125 "[m]ore broadly . . . creates a remedy against a person who engages in unfair competition by, *inter alia*, falsely designating the origin of a product." *Id.* In other words, § 1125 protects an *un*registered mark against "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, . . . which—(A) is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . ." 15

15

U.S.C. § 1125(a)(1)(A); *see Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

Through the tort of "unfair competition," Indiana common law similarly provides a remedy against "attempt[s] to create confusion concerning the source of the unfair competitor's goods." *Gabet v. Amazon.com Inc.*, 693 F. Supp. 3d 966, 974 (S.D. Ind. 2023). Because Indiana trademark infringement and unfair competition claims are analyzed in the same manner as Lanham Act claims, we shall combine Banjo's legal claims for purposes of our analysis. *Fortes Grand Corp. v. Warner Bros. Ent. Inc.*, 763 F.3d 696, 700 n.4 (7th Cir. 2014) (collecting cases); *accord Dwyer Instruments, Inc. v. Sensocon, Inc.*, 873 F. Supp. 2d 1015, 1040 (N.D. Ind. 2012).

To prevail on its claims in this lawsuit, Banjo "must establish that (1) its mark is protectable and (2) the defendant's use of the mark is likely to cause confusion among consumers." *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 673–74 (7th Cir. 2001); *see also Keaton & Keaton v. Keaton*, 842 N.E.2d 816 (Ind. 2006) (trade name infringement under Indiana law requires showing of a likelihood of confusion). We turn to these elements below, highlighting any legal distinctions among Banjo's theories of relief as necessary.

## A.    Protectable Mark

A mark is protectable if it "is either inherently distinctive or has acquired secondary meaning." *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998). Secondary meaning (or acquired distinctiveness) is "a link in the minds of consumers between the marked item and its source." *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855,

857 (7th Cir. 2010). A non-inherently distinctive mark, such as a color, achieves secondary meaning when it "identifies and distinguishes a particular brand (and thus indicates its 'source')." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163 (1995). "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Id.* (citation modified).

If an asserted mark "is not registered with the United States Patent and Trademark Office, the burden is on the claimant . . . to establish that it is entitled to protection under [§ 1125(a)] of the Lanham Act." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 727 (7th Cir. 1998). However, once a mark is registered, the Lanham Act "affords the registrant the rebuttable presumption of validity." *CAE, Inc.*, 267 F.3d at 673 (quoting 15 U.S.C. § 1115(a)); *see also* 15 U.S.C. § 1057(b) (certificate of registration is prima facie evidence of trademark validity). "[T]he presumption of validity that registration creates is easily rebuttable, since it merely shifts the burden of production to the alleged infringer." *Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 486 (7th Cir. 2007); *e.g.*, *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169 (7th Cir. 1996) ("The presumption of validity that federal registration confers evaporates as soon as evidence of invalidity is presented." (internal citation omitted)).

A "defendant may overcome th[e] presumption with evidence that the mark is merely generic or descriptive, or that it lacks secondary meaning." *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 639 (7th Cir. 2001). "Secondary meaning can be established through direct costumer testimony, consumer surveys, length and manner of use, amount

and manner of advertising, volume of sales, place in the market, and proof of intentional copying. *Thomas & Betts Corp.*, 138 F.3d at 291.

Applying these legal principles to the case at bar, we hold that Banjo's Yellow Handle® Design became presumptively valid upon its registration on December 28, 2021. Dkt. 124-16. Consequently, Green Leaf bears the burden of proof to establish a lack of secondary meaning with regard to Banjo's trademark infringement claims. *Packman*, 267 F.3d at 639.[2]

Based on our review of the record, we conclude that Banjo has adduced sufficient evidence from which a reasonable jury could find that the Yellow Handle® Design holds a secondary meaning. The record evidence demonstrates that Banjo has used yellow as a signature feature of its brand since 1994, Hays Decl. ¶ 3, dkt. 112-1, and that, by the early 2000s, Banjo represented its control valves as the "original yellow handle," Wagner Aff. ¶ 12, dkt. 124-5; Bezdicek Aff. ¶ 10, dkt. 124-7. Banjo's success with its Yellow Handle® valves is convincingly established by Mr. Hays's (unchallenged) Declaration stating that Banjo has in the past sold 675,000 units on an annual basis, amounting to "tens of millions of dollars." Hays Decl. ¶ 3, dkt. 112-1.

---

[2] Since unregistered marks are not afforded the presumption of validity, plaintiffs asserting § 1125 and/or common law claims typically bear the burden of proving the protectability of their mark. *See Platinum Home Mortg. Corp.*, 149 F.3d at 727. In this case, the parties have not elucidated whether or how trademark registration affects their respective burdens of proof apropos of Banjo's pre-registration claims under § 1125 and Indiana common law: Banjo flatly insists that its December 2021 registration places the burden of proof on Green Leaf entirely, dkt. 111 at 19, 23; dkt. 132 at 7, 15, 18, 22; while Green Leaf, at most, asserts without citation to any legal authority or further elaboration that "there is no legal presumption of ownership without federal trademark registration," dkt. 124-3 at 11–12.

Banjo's best evidence of secondary meaning consists of numerous email exchanges among members of Green Leaf's executive team documenting its intentional copying of Banjo's trade dress. "Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 663 (7th Cir. 1995). "In that situation, the defendant's belief that plaintiff's trade dress has acquired secondary meaning—that that his copying will indeed facilitate his passing off—is some evidence that the trade dress actually has acquired secondary meaning." *Id.*

Here, Green Leaf's internal correspondence supports a finding that Green Leaf understood that Banjo's yellow handled control valves had acquired distinctiveness in the industry and deliberately designed its TerreMax products to be virtually indistinguishable from Banjo's. Notable evidence supporting a finding that Green Leaf understood the acquired distinctiveness of the yellow handle includes: an August 2017 email wherein Mr. Goda described "green handled green leaf [a]s junk and yellow handled [a]s good," dkt. 112-21 at 3; a December 2016 email to Mr. Goda relaying that "[c]ustomers are willing to pay more because Banjo product is so good," dkt. 112-22; and a December 2017 email from Mr. Wagner stating that he "prefer[s] yellow handle cause [sic] the customers ask fewer questions," dkt. 112-28 at 3. Substantial record evidence further establishes the extensive efforts undertaken by Green Leaf to "copy[ ] Banjo to look identical." Dkt. 112-25 at 3 (July 2017 email from Mr. Goda). Indeed, in 2017, Green Leaf budgeted $250,000 for "new tooling to duplicate Banjo." Dkt. 113-2 at 4 (capitalization modified) (under seal).

None of Green Leaf's arguments to the contrary suffice to establish Green Leaf's entitlement to judgment as a matter of law. Green Leaf's assertion that Banjo's common law claim fails because Banjo "was not the first to use the yellow handle or the lever shape for which it is alleging trademark protection," dkt. 124-3 at 11, is a non-starter because Banjo does not assert a protectable interest in the lever shape itself: rather, Banjo's trademark registration encompasses any shade of yellow valve handle in the generic shape depicted in the registration certificate. *See* dkt. 124-16. In any event, Green Leaf's only supporting legal authority is a 1975 Fifth Circuit decision concerning trademark infringement under Texas common law, *see Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975), which authority is neither binding nor persuasive for our purposes. *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994).

Green Leaf also contends that, prior to the instant lawsuit, Banjo failed to put its competitors on notice of its trademark rights by omitting the ™ (for common law trademarks) and/or ® (for registered trademarks) symbols that would otherwise indicate Banjo's claimed ownership interest in the Yellow Handle® Design. Dkt. 124-3 at 12. Green Leaf's internal correspondence, as referenced above, puts the lie to Green Leaf's assertion, however, that it was unaware of the source-identifying significance of yellow handled control valves. Thus, Green Leaf's purported lack of notice falls short as support for a judgment in its favor.

Green Leaf's remaining arguments relate to the denial of Banjo's 2018 trademark application as well as the purported sales of yellow handled control valves by third parties.

Dkt. 124-3 at 12–13.[3] The contestability of these issues further buttresses our conclusion that material factual disputes preclude the entry of judgment in Green Leaf's favor. Viewing the record evidence detailed above in the light most favorable to Banjo, as we must in resolving Green Leaf's motion for summary judgment, we conclude that a reasonable jury could find that Banjo's Yellow Handle® Design holds secondary meaning and is therefore a protectable mark.

### B.    Likelihood of Confusion

The hallmark "of trademark infringement is 'likelihood of confusion' as to source, affiliation, connection or sponsorship of goods or services among the relevant class of customers and potential customers." *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015) (citation modified). "To decide whether there is a likelihood of confusion, a court must ask whether consumers, and specifically consumers who would use either product, would be likely to attribute them to a single source." *Id.* (citation modified). Confusion "must be 'probable,' " not merely "possible." *Id.* "[T]he question of whether likelihood of confusion exists may be resolved on summary judgment 'if the evidence is so one-sided that there can be no doubt about how the question should be answered.' " *CAE, Inc.*, 267 F.3d at 677 (quoting *Door Sys., Inc.*, 83 F.3d at 173). "Likelihood of confusion is a question of fact, usually reserved for the jury." *Sorensen*, 792 F.3d at 726.

---

[3] Banjo objects to Green Leaf's reliance on the 2018 trademark application materials on the grounds that "statements of trademark examiners are inadmissible." Dkt. 132 at 13. Aside from a handful of footnote citations to non-binding legal authorities, Banjo does not articulate nor develop further its argument as to how such evidence is inadmissible. We therefore express no view as to the admissibility of the 2018 trademark application materials at this juncture.

There are seven factors bearing on an assessment of the likelihood of confusion: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to "palm off" its product as that of another. *Id.* Although "no single factor is dispositive," the Seventh Circuit has identified "three [as] especially important: the similarity of the marks, the intent of the defendant, and evidence of actual confusion." *Id.*

Here, we conclude that Banjo has adduced sufficient evidence to create a triable question of fact as to the likelihood of consumer confusion. As detailed above, Green Leaf literally designed TerreMax products to serve as direct and (arguably) indistinguishable substitutions to Banjo's. *See generally* dkt. 113-2 (under seal) (retooling and price comparison breakdowns); dkt. 112-23 (Green Leaf ordering yellow valve handles to match Banjo's); dkt. 113-3 at 5 (September 2020 email describing TerreMax products as "exact physical duplicates of the Banjo items") (under seal). Further indication of the likelihood of confusion is evidence of *actual* confusion: in April 2021, one distributor relayed to Mr. Wagner that "[c]ustomers can't tell a difference" between TerreMax and Banjo products, dkt. 112-37 at 3; in June and July 2023, Banjo received customer complaints about defective products that were in fact purchased from TerreMax, dkt. 112-4; and, in February 2020, John Bray, Green Leaf's Regional Accounts Manager, confused TerreMax valve handles as belonging to Banjo, dkt. 112-36. In short, a non-exhaustive review of the evidence in the record before us reveals a sufficient basis on which a reasonable jury could

conclude that Green Leaf's imitation of Banjo's Yellow Handle® Design created a likelihood of customer confusion.

Because Green Leaf has failed to establish its entitlement to judgment as a matter of law on the first and second essential elements of Banjo's claims, Green Leaf's motion for summary judgment must be and therefore shall be **denied**. Dkt. 124.

## II. Green Leaf's Affirmative Defenses

The parties have cross-moved for summary judgment on Green Leaf's affirmative defenses. As the party asserting the affirmative defenses, Green Leaf bears the burden of identifying evidence upon which a jury could find in its favor. *C & N Corp. v. Kane*, 953F. Supp. 2d 903, 910 (E.D. Wis. 2013), *aff'd sub nom. C & N Corp. v. Gregory Kane & Illinois River Winery, Inc.*, 756 F.3d 1024 (7th Cir. 2014).

### A. Statute of Limitations

The Lanham Act does not contain a specific statute of limitations. Thus, courts in our circuit (and beyond) turn to analogous state limitation periods. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821 (7th Cir. 1999). Here, both parties agree that the applicable statute of limitations, as provided by Indiana law, is two years. Dkt. 111 at 27; dkt. 124-3 at 32–33 (citing Ind. Code § 34-11-2-4).

Green Leaf argues that the two-year statute of limitations renders this lawsuit entirely time-barred. In Green Leaf's view, Banjo was undeniably aware of the alleged infringement by February 2018, when it sent the cease-and-desist letter to Green Leaf. Thus, Green Leaf contends, Banjo's September 2023 Complaint—more than five years later—was untimely. Dkt. 124-3 at 33.

Banjo counters that the "continuing violation doctrine" permits it to maintain this lawsuit, even if certain aspects of Green Leaf's alleged misconduct pre-date the applicable limitations period. Dkt. 111 at 27–28. The continuing violation doctrine is a rule of accrual that treats a "cause of action [as] accru[ing] at the date of the last injury." *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001) (citation modified) (reversing and remanding dismissal of Eighth Amendment claim arising out of prison officials' years-long refusal to treat medical condition). "A violation is 'continuing,' signifying that a plaintiff can reach back to its beginning even if that beginning lies outside the statutory limitations period, when it would be unreasonable to require or even permit him to sue separately over every incident of the defendant's unlawful conduct." *Id.* The continuing violation doctrine "ensure[s] that illegal conduct is punished by preventing a defendant from invoking the earliest manifestation of its wrongdoing as a means of running out the limitations clock on a course of misconduct that persisted over time." *United States v. Spectrum Brands, Inc.*, 924 F.3d 337, 350 (7th Cir. 2019). "[W]here the violation at issue can be characterized as a continuing wrong, the limitations period begins to run *not* when an action on the violation could first be brought, but when the course of illegal conduct is complete." *Id.* (citing *Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir. 1983) (finding that the defendant's copyright infringement constituted a continuing wrong)).

Green Leaf does not proffer a response to Banjo's continuing violation argument. *See* dkt. 134. That failure alone is a sufficient basis on which to find that Banjo is entitled to judgment on Green Leaf's statute of limitations defense. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in

waiver."). In any event, a straightforward application of the doctrine leads us to conclude that Green Leaf's allegedly infringing conduct constitutes a continuing wrong that effectively postpones the accrual of Banjo's causes of action. As reflected in the record, Green Leaf's alleged misconduct—e.g., its production and sale of yellow-handled valves and its retooling operation—is active and ongoing. *See, e.g.*, Bezdicek Dep. 82:8, dkt. 112-19 (testifying that Green Leaf was "halfway" through retooling). Because Green Leaf's alleged "course of illegal conduct" is not yet complete, the limitations period has not begun to run, and this action is therefore timely. *Spectrum Brands*, 924 F.3d at 350.

For these reasons, we shall **grant** Banjo's motion for summary judgment, dkt. 87, and **deny** Green Leaf's cross-motion for summary judgment, dkt. 124, as to Green Leaf's statute of limitations defense.

### B.    Laches

The equitable doctrine of laches originates "from the maxim that those who sleep on their rights, lose them." *Hot Wax*, 191 F.3d at 820–21. "Laches addresses delay in the pursuit of a right when a party must assert that right in order to benefit from it." *Id.* at 820. District courts "enjoy[ ] considerable discretion in determining whether to apply the doctrine of laches . . . ." *Id.* at 819. "Laches is generally a factual question not subject to summary judgment," though a decision may be rendered at the summary judgment stage if "no genuine factual issues are in dispute." *Jeffries v. Chicago Transit Auth.*, 770 F.2d 676, 679 (7th Cir. 1985). For laches to apply in this case, Green Leaf must show "an unreasonable lack of diligence by the party against whom the defense is asserted and prejudice arising from this lack of diligence." *Hot Wax*, 191 F.3d at 822.

25

In the context of a Lanham Act case, such as the one at bar, "[t]he notion of a 'continuing wrong,' . . . provides a strong justification for the application of the doctrine of laches in appropriate circumstances[,] regardless of whether the plaintiff has brought suit within the analogous statute of limitations." *Id.* at 821. "Without the availability of the application of laches to a claim arising from a continuing wrong, a party could, theoretically, delay filing suit indefinitely." *Id.* At bottom, "it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful [its] competitor will be and then destroy with the aid of court decree, much that the competitor has striven for and accomplished." *Id.* at 824 (citation modified). The Seventh Circuit has also remarked that, "[i]n the context of a trademark infringement action, . . . although laches may bar a plaintiff from recovering damages or wrongfully derived profits during the time prior to filing suit, upon a showing of infringement, the plaintiff may still be entitled to injunctive relief and to damages and profits for the period subsequent to the filing of suit because of the continuous nature of trademark infringement." *Id.* at 824 n.3.

With these legal principles in mind, we turn to Green Leaf's laches defense.

### 1.    *Unreasonable Delay*

As previously noted, "[b]ecause the Lanham Act does not contain a statute of limitations, federal courts have referred to analogous state statutes of limitations to determine whether a presumption of laches should apply." *Id.* at 821. In addition, as also noted above, both parties here recognize that Indiana law provides a two-year statute of limitations. Dkt. 111 at 27; dkt. 124-3 at 32–33 (citing Ind. Code § 34-11-2-4); *see, e.g., Gema USA, Inc. v. First in Finishing Inc.*, No. 1:22-CV-02053-TWP-KMB, 2025 WL 3073875, at *22 (S.D.

Ind. Mar. 27, 2025), *appeal docketed*, No. 26-1075 (Fed. Cir. Oct. 22, 2025) (collecting cases applying Indiana's two-year statute of limitations for injuries to personal property to Lanham Act claims). We thus shall apply this two-year limitations period "as [our] base-line" in determining whether the "presumption of laches exists." *Hot Wax*, 191 F.3d at 821.

Evidence before us reveals that Banjo believed as early as February 2018 that Green Leaf was engaging in actionable misconduct. In the February 20, 2018, cease and desist letter, Banjo specifically asserted that Green Leaf had "started advertising certain . . . products that have a distinctive yellow handle in violation of Banjo's protected trade dress." Dkt. 124-9 at 1. Banjo also objected to Green Leaf's creation of a Part Compatibility Guide, which not only represented Green Leaf's products as being "one-to-one replacements" for Banjo's products but also mimicked Banjo's parts numbering system. *Id.* Banjo explicitly linked these developments to Green Leaf's hiring of Messrs. Wagner and Bezdicek. *Id.* at 2. Measured against a two-year limitations period, Banjo's five-year delay in filing suit could arguably be regarded as unreasonable.

That said, "[a]ttempts to resolve a dispute without resorting to a court do not constitute unreasonable delay for determining the applicability of the doctrine of laches." *Hot Wax*, 191 F.3d at 823–24 (characterizing five letters sent between 1993 and 1995 as a "sparse letter writing campaign can hardly be characterized as a serious attempt to resolve [the plaintiff's] concerns"). Applying this principle to the case at bar, Banjo's cease-and-desist letter could similarly be viewed as an effort to resolve the dispute between the parties without resorting to litigation. Additional examples of Banjo's efforts to stake out its interest in yellow handled valves include its 2018 trademark application, the successful

registration of its Yellow Handle® Design in December 2021, and the July 2022 negotiations between IDEX and Green Leaf about a potential acquisition (though the parties adhere to conflicting views about IDEX's motivation in initiating those talks).

Our review of the record makes clear to us that further factual development is necessary to resolve the parties' legal arguments concerning the applicability of the doctrine of laches here. In view of our inability to fully resolve the question of whether Banjo's delay in filing suit was unreasonable, we must also sidestep an analysis and resolution of the remaining issues of prejudice as well as Banjo's defenses of unclean hands, the public interest, and progressive encroachment. Accordingly, the parties' cross-motions for summary judgment shall be **denied** as to the issue of laches and their other related defenses.

## C.    Functionality & Lack of Secondary Meaning

"The doctrine of functionality prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex*, 514 U.S. at 164. "A product feature is considered functional and ineligible for trademark protection if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632, 644 (7th Cir. 2020) (internal quotation and citation omitted). "Even if a product feature does not satisfy that definition, it can still be [regarded as] functional if it is a 'competitive necessity, that is, if its exclusive use 'would place competitors at a significant non-reputation-related disadvantage.' " *Arlington Specialties, Inc. v. Urb. Aid, Inc.*, 847 F.3d 415, 419 (7th Cir. 2017) (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32–33 (2001)); *see also*

*Qualitex*, 514 U.S. at 165 (noting that "sometimes color plays an important role (unrelated to source identification) in making a product more desirable, sometimes it does not").

> The following considerations are probative of functionality:
>
> (1) the existence of a utility patent, expired or unexpired, that involves or describes the functionality of an item's design element; (2) the utilitarian properties of the item's unpatented design elements; (3) advertising of the item that touts the utilitarian advantages of the item's design elements; (4) the dearth of, or difficulty in creating, alternative designs for the item's purpose; (5) the effect of the design feature on an item's quality or cost.

*Georgia-Pac. Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727–28 (7th Cir. 2011). The existence of an expired or unexpired utility patent constitutes "strong evidence that the features therein claimed are functional." *TafFix Devices, Inc.*, 532 U.S. at 29–30. "Functionality is a factual question, but the bar for functionality is so low that it can often be decided as a matter of law . . . ." *Arlington Specialties, Inc.*, 847 F.3d at 419–20 (citation modified). Because "registration creates a presumption of validity, . . . the defendant has the laboring oar on all issues relating to validity, including functionality." *Publications Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 340 (7th Cir. 1998).

Here, there is no evidence relating to the existence of a utility patent or advertisements touting the utilitarian advantages of a yellow handled control valve (nor, for that matter, of handles in any other color). Nor is there evidence that the color of the valve handles affects their cost or quality. To the contrary, the unchallenged deposition testimony of Green Leaf's Vice President of Engineering Curtis Owens ("Mr. Owens") reveals that the cost difference between green and yellow handles is, at best, "very insignificant." Owens Dep. 52:5–11, dkt. 112-18; *see also* Goda Dep. 25:22–23, dkt. 112-16 (describing

difference between Green Leaf and TerreMax as "a branding thing"). Mr. Owens further testified that green and yellow "valves are basically the same valves, just with different color handles." Owens Dep. 52:2–4, dkt. 112-18. These factors therefore weigh against a finding of functionality.

The remaining considerations bearing on functionality relate to the purported utilitarian benefits of using yellow and the existence of alternative designs. Green Leaf argues that the color yellow serves a functional purpose due to its high visibility, which makes it the safest and most attractive option for use in the low visibility and muddy conditions that are common to construction and agricultural worksites. Goda Aff. ¶ 3, dkt. 124-4; Wagner Aff. ¶ 8, dkt. 124-5; Bezdicek Aff. ¶ 30, dkt. 124-7; Teko Aff. ¶ 18, dkt. 124-17.[4]

In rebuttal, Banjo emphasizes that no contemporaneous Green Leaf documents identify safety and/or better visibility as the basis for selecting the color yellow over any other available color. Dkt. 132 at 32. Further undermining the purported utility of the color yellow, Banjo argues, is the availability of design alternatives—that is, of other bright and highly visible colors—that can achieve the same alleged utilitarian benefits without

---

[4] Green Leaf's functionality defense rests largely on the (challenged) expert testimony of Steven Bleicher ("Mr. Bleicher"). Dkt. 124-3 at 28–30. In September 2025, well after the instant cross-motions were fully briefed, Green Leaf informed the Court of Mr. Bleicher's death. Dkt. 145. Green Leaf was permitted to engage a substitute expert witness with the caveat that the testimony of such replacement expert could not exceed the scope of Mr. Bleicher's expert report. Dkt. 184; *Stringer v. Cambria Fabshop-Indianapolis, LLC*, No. 1:13-CV-00659-SEB-TAB, 2015 WL 13632234 (S.D. Ind. Oct. 2, 2015). Banjo has objected to the admissibility of Green Leaf's substitute expert witness's testimony. Dkt. 193. For purposes of resolving the parties' cross-motions for summary judgment, we shall address the record as it stands, which means based on Mr. Bleicher's opinion(s). Banjo's (and, for that matter, Green Leaf's) evidentiary objections will be resolved in due course in other contexts of this litigation.

meaningful impact on the product's quality or cost. According to Banjo, "there is no functional need to use yellow," since "other colors can be and are used." Dkt. 111 at 25.

"Alternative designs can be 'part of the total evidentiary matrix to be weighed' in deciding whether claimed trade dress is functional." *Arlington Specialties, Inc.*, 847 F.3d at 420 (quoting J. Thomas McCarthy, 1 *McCarthy on Trademarks and Unfair Competition* § 7:75 (4th ed. 2008)). That said, the Supreme Court has also noted "that a design is legally functional, and thus unprotectable, if it is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection." *Two Pesos, Inc.*, 505 U.S. at 775. Although we are skeptical about the functional advantage of the color yellow (as opposed to other bright colors), we find that the parties competing contentions about the utility of the color yellow and the availability of design alternatives creates a triable question of fact as to whether color is in fact an essential component of control valve handles' use and/or purpose.

Even if the color yellow does not serve a utilitarian function, however, a showing of "esthetic functionality" may still preclude trademark protection if "exclusive use of the feature would place competitors at a significant non-reputation-related disadvantage." *Flexible Steel Lacing Co.*, 955 F.3d at 644 (citation modified). The hallmark of esthetic functionality is, at bottom, "whether the recognition of trademark rights would significantly hinder competition." *Qualitex*, 514 U.S. at 170 (citation modified). Esthetic functionality has been applied, in one example, to "permit[ ] competitors to copy the green color of farm machinery" where the "customers wanted their farm equipment to match." *Id.* at 169 (citing *Deere & Co. v. Farmhand, Inc.,* 560 F. Supp. 85, 98 (SD Iowa 1982), *aff'd*, 721 F.2d 253

31

(8th Cir. 1983)); *see also Arlington Specialties, Inc.*, 847 F.3d at 420 (noting that "attractiveness is a *kind* of function") (emphasis in original).

Here, Green Leaf contends that customers in the commercial agricultural industry prefer yellow handled valves due to the perception that "what's sold in Tractor Supply" or in any other retail store "is inferior quality to what's sold in some other distribution shop." Goda Dep. 84:16–19, dkt. 134-2. Green Leaf has historically sold its green handled valves in retail stores. Thus, it argues that Banjo's trademark on the "entire spectrum of the color yellow" unduly hinders its ability to enter and to compete successfully in commercial agriculture. Dkt. 134 at 15 (citing Goda Aff. ¶ 18, dkt. 124-4).

This theory is, in our view, underdeveloped by Green Leaf, as Mr. Goda's non-specific testimony gives rise to too many alternative explanations for consumer behavior. On the other hand, Banjo's responsive argument that Green Leaf (and others) can and do sell non-yellow handled valves falls short of demonstrating conclusively that such competitive success is achieved *in the relevant industry* (i.e., in commercial agriculture). These deficiencies in the parties' arguments, coupled with the competing evidence presented by Banjo regarding the source-identifying significance of the color yellow, persuade us that summary judgment cannot be granted in favor of either party. The parties' cross-motions for summary judgment shall each be **denied** accordingly.

### D.    Abandonment

A trademark is considered abandoned "[w]hen its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. Where abandonment is found, the holder of the abandoned mark loses all rights to the exclusive use and ownership of the mark:

"Once a mark is abandoned, it returns to the public domain, and may be appropriated anew." *Specht v. Google Inc.*, 747 F.3d 929, 935 (7th Cir. 2014).

Green Leaf argues that Banjo abandoned its trademark by permitting third parties, including Green Leaf, to sell yellow handled control valves. Although there is evidence that other competitors have occasionally sold yellow handled valves, *see* Hays Decl. ¶ 4, dkt. 112-1, Green Leaf has failed to adduce any relevant evidence revealing the extent to which third parties used, promoted, and became known by the consuming public as the source of yellow handled control valves. *See McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1171 (7th Cir. 1986) (third-party usage is material "only to the extent that the similar marks are promoted by their owners and recognized by the consuming public"); *CAE, Inc.*, 267 F.3d at 685 (same). Thus, there is no basis on which a reasonable jury could conclude that third parties' occasional sales of yellow handled valves weakened Banjo's trademark to the point of abandonment.

Tellingly, Green Leaf's reply brief offers no rebuttal argument on the issue of abandonment. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011). As such, Banjo is entitled to judgment as a matter of law on the issue of abandonment, and its summary judgment motion shall be **granted** accordingly. Green Leaf's request for summary judgment shall be **denied**.

### E.    Lack of Trademark Significance (Genericness)

In trademark law, "generic terms receive no trademark protection." *Mil-Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996). When a mark is federally registered, as is the Yellow Handle® Design at issue here, the burden is on the opposing party

to establish that the mark is generic and therefore unprotectable. *See id.* A generic mark "is one that is commonly used to name or designate a kind of good." *Id.* at 1157. "Unlike a trademark, which identifies the source of a product, a generic term merely specifies the type, or genus, of thing into which common linguistic usage consigns that product." *Id.* (citation modified). Under the Lanham Act, the genericness assessment focuses on the mark's "primary significance . . . to the relevant public." 15 U.S.C. § 1064(3).

"Significant use of a term by competitors in the industry has traditionally been recognized, along with dictionary evidence, as indicating genericness." *Mil-Mar Shoe Co.*, 75 F.3d at 1159. *See also Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 965 (Fed. Cir. 2015) (listing "consumer surveys, dictionaries, newspapers, and other publications" as "competent sources" for evidence of genericness). Genericness is typically a question of fact that cannot be resolved on summary judgment unless "the evidence is so one-sided that there can be no doubt about how the question should be answered." *Door Sys., Inc.*, 83 F.3d at 171.

In this case, Green Leaf has adduced no such evidence establishing that Banjo's Yellow Handle® Design is generic as a matter of law. Green Leaf's best evidence is Mr. Goda's affidavit testimony that "98% of manufacturers . . . s[ell] yellow handled control valve[s]," Goda ¶ 10, dkt. 124-4; and Messrs. Wagner's and Bezdicek's affidavit testimonies that other competitors have sold yellow handled control valves for decades, Wagner Aff. ¶ 12, dkt. 124-5; Bezdicek Aff. ¶ 7, dkt. 124-7. "Because the vast majority of manufacturers . . . sell valves with yellow handles," Green Leaf argues, "the overwhelming evidence

indicates that yellow handles on control valves are in indication of the type of product rather than its source being Banjo." Dkt. 124-3 at 27.

Green Leaf's barebones evidence that some competitors also sell yellow handled valves falls short of establishing the genericness of Banjo's trademark through *significant* use by others in the liquid-handling industry. At this stage in the litigation, Green Leaf "must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005). To the extent that competitors do in fact sell yellow handled valves, Green Leaf has pointed to no evidence of the success of such sales, never mind that such sales have affected consumers' understanding of the source-identifying significance of the color yellow. We have little trouble in concluding that Green Leaf has failed to adduce sufficient evidence to present the question of genericness to a jury. On the issue of genericness, summary judgment shall be **granted** in Banjo's favor: Green Leaf's cross-motion shall likewise be **denied**.

## III.    Green Leaf's Counterclaim

The Lanham Act provides that "[i]n any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." 15 U.S.C. § 1119. In this case, Green Leaf asserts that Banjo's trademark should be canceled because: (1) the trademark is functional; (2) Banjo abandoned the trademark; and (3) the trademark is generic.

Since Grean Leaf's theories in support of cancellation are identical to its functionality, abandonment, and genericness defenses, our analyses above apply to Green Leaf's

counterclaim as well. Accordingly, Banjo's motion for summary judgment on Green Leaf's counterclaim shall be **granted in part** as to abandonment and genericness and **denied in part** as to functionality. Green Leaf's motion for summary judgment on its counterclaim shall also be **denied**.

## IV.    Miscellaneous Matters

Before concluding, we must address several miscellaneous issues raised in the parties' summary judgment briefs.

First, Green Leaf alleges that Banjo purchased and registered various domain names containing references to Green Leaf and its products in order to redirect internet traffic to Banjo's own webpage. Dkt. 124-3 at 7–8, 24–25. In October 2024, Green Leaf sought leave to amend its answer to add a counterclaim for cyberpiracy, pursuant to 15 U.S.C. § 1125(d). Dkt. 67. On November 14, 2024, Magistrate Judge Garcia of our Court denied Green Leaf's motion as untimely. Dkt. 69. Green Leaf's allegations of cyberpiracy extend beyond the scope of the legal claims pending in this lawsuit; thus, we do not address them further.

Second, Green Leaf has raised several additional grounds in support of the cancellation of Banjo's trademark that were not included in its answer, dkt. 14: to wit, that Banjo's 2020 trademark application contained "wholly incorrect and misleading" representations of fact. Dkt. 124-3 at 6, 35. Green Leaf contends that Banjo's alleged misrepresentations warrant the cancellation of Banjo's Yellow Handle® Design. However, since this theory was not timely asserted in the relevant pleadings, dkt. 14, it too falls beyond the scope of the issues to be resolved by the jury.

Third, Green Leaf requests a preemptive limitation on the scope of damages that Banjo might seek to recover at trial. Dkt. 124-3 at 38–41. According to Green Leaf, § 1111 of the Lanham Act precludes Banjo from seeking certain kinds of damages: Section 1111 provides, in relevant part, that "no profits and no damages shall be recovered . . . unless the defendant had actual notice of the registration."[5] Additionally, Green Leaf requests that we exclude lost profits from valve component parts (e.g., piping, fittings, etc.) as a basis of Banjo's potential recovery. We defer a resolution of issues relating to damages until there is a finding of liability.

## CONCLUSION

For the reasons stated above, Banjo's Partial Motion for Summary Judgment is hereby **GRANTED in part** and **DENIED in part**. Dkt. 84. Banjo's motion is <u>granted</u> as to the affirmative defenses of statute of limitations, abandonment, and genericness; and as to Green Leaf's counterclaim for cancellation of Banjo's trademark based on the theories of abandonment and genericness. Banjo's motion is <u>denied</u> as to Green Leaf's affirmative defenses of laches and functionality; and as to Green Leaf's counterclaim for trademark cancellation based on functionality.

Green Leaf's Cross-Motion for Summary Judgment is hereby **DENIED**. Dkt. 124.

The parties should prepare to try the following issues, unless they are abandoned by the party advancing the specific claim prior to trial:

---

[5] It is well established that "§ 1111 does not create a defense; it is a limitation on remedies" only. *United States v. Sung*, 51 F.3d 92, 94 (7th Cir. 1995). Thus, Banjo's request that we "strike" Green Leaf's § 1111 "defense" is misplaced. Dkt. 132 at 37.

- Banjo's claim for trademark infringement, pursuant to 15 U.S.C. § 1114(1);

- Banjo's claim for unfair competition, pursuant to 15 U.S.C. § 1125(a);

- Banjo's claim for trademark infringement and unfair competition, pursuant to Indiana common law;

- Green Leaf's affirmative defense of laches as well as Banjo's defenses of unclean hands, public interest, and progressive encroachment;

- Green Leaf's affirmative defense of functionality; and

- Green Leaf's counterclaim for cancellation based on functionality.

IT IS SO ORDERED.

Date:

_____1/9/2026_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jennifer L. Blackwell
ORZESKE & BLACKWELL, P.C
jblackwell@indylitigation.com

Charles W. Browning
PLUNKETT & COONEY, P.C.
cbrowning@plunkettcooney.com

William Michael Etienne
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
metienne@taftlaw.com

Roma Lopes
Foley & Lardner LLP
rlopes@foley.com

Dwight D. Lueck
BARNES & THORNBURG
dwight.lueck@btlaw.com

Jonathan Moskin
Foley & Lardner LLP
jmoskin@foley.com

Donald G. Orzeske
ORZESKE & BLACKWELL, P.C
dorzeske@indylitigation.com

Pamela A. Paige
Plunkett Cooney, P.C.
ppaige@plunkettcooney.com

Caroline Payne
Barnes and Thornburg
caroline.payne@btlaw.com

Jonathan G. Polak
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
jpolak@taftlaw.com

Dana A. Sarros
Barnes & Thornbug LLP
One North Wacker Drive
Suite 4400
Chicago, IL 60606-2833

William C. Wagner
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
wwagner@taftlaw.com